*E-FILED - 5/12/08*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN J. KING, | No. C 04-3069 RMW (PR) |
| Petitioner, | |
| vs. | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| JOE McGRATH, Warden, | |
| Respondent. | |

Petitioner, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for robbery with the use of a firearm. The trial court enhanced petitioner's sentence based upon his prior convictions, prior serious felonies and prior prison terms. Petitioner was sentenced to a term of forty-nine years-to-life in state prison. The California Court of Appeal affirmed the conviction and sentence in 2002. The California Supreme Court denied a petition for review in 2004.

Petitioner alleges the following claims for habeas relief: (1) ineffective assistance of trial counsel in counsel's failure to object to the jury instructions and failure to object to the admission of certain evidence, and (2) the trial court improperly instructed the jury that it could consider false statements made by a defendant as proof of consciousness of guilt and admissions made by

a defendant as tending to prove guilt, pursuant to CALJIC No. 2.03 and CAL JIC No. 2.71.

The court ordered respondent to show cause as to why the petition should not be granted. Respondent filed an answer addressing the merits of the petition and petitioner has filed a traverse. After reviewing the papers and the relevant portions of the record, the court concludes that petitioner is not entitled to habeas corpus relief based on the claims presented. Accordingly, the court denies the petition.

## I. FACTS

The California Court of Appeal found the facts to be as follows:

> Defendants, King and Blanton, who had started living together in December 2001, left their apartment in their Mercury Cougar around 4:00 or 5:00 p.m. on January 4, 2002, and made a number of visits to the Castroville Taco Bell between 6:00 and 10:00 p.m. At 6:00 p.m. they ate there; around 7:30 or 8:00 p.m., Blanton [petitioner's live-in girlfriend] returned and bought food to go; and later, she returned and walked to the bathroom. Marina Guzman, the Taco Bell night manager, did not see her leave the restaurant on that occasion. Both defendants returned later, King first around 8:00 p.m. and Blanton, alone, about 9:00 p.m. King walked toward the bathroom; Blanton ordered food and then left. About an hour later, when Guzman was cleaning the dining room in preparation for closing around 10 p.m., and employee Florita Sanchez was washing dishes, King entered and walked toward the bathroom. He had a backpack on his back and wore nothing on his head. No customers were present. After a few minutes, as Sanchez stood in the kitchen doorway and watched, Guzman checked the women's room and found no one there. When she tried the men's room door, however, she was unable to push it all the way open because King, wearing a knit mask that covered his head except for his eyes and mustache, emerged holding a gun in gloved hands. Guzman described the knit mask as being dark-colored; Sanchez said it was tan. Pointing the gun at Guzman and Sanchez, King moved them into the kitchen.
>
> At defendant's direction, Guzman opened the safe beneath the front counter. King put his gun on the floor momentarily while he removed a small box containing cash and coins. Guzman and Sanchez looked at each other but did not try to take it. Guzman thought the gun was dark metal and had a long barrel, while Sanchez said it was black and silver metal with a barrel about four or five inches long. Defendant also ordered Guzman to open the cash register and put the money in a bank bag. She opened the register with a key on a ring containing other keys and at his discretion left the key in the cash register. King then gave the keys to Sanchez and ordered her to open the drive-through cash register while still holding the gun. Sanchez opened the register and King took the money from her. He then left the restaurant. He was also holding another object, which he spoke into as if communicating with another person through it. He said he would be going out and he used the word "honey." He was nervous and shaking and left through the kitchen door, which Guzman closed before she called the police.
>
> Two eyewitnesses saw defendant leave the Taco Bell at about 10:00 p.m. William Franco, a delivery person for Taco Bell's neighbor, Round Table Pizza, was putting a pie into the restaurant's delivery vehicle in the alley behind the businesses. He saw a white male, between 27 and 35 years old with very short blond or brown hair, or who may have been bald in front, picking up money from the ground and pushing it into

a bag or box. Then, a white Ford or Mercury drove past Franco up the alley and turned right on Merritt Street where he could not see it. However, he heard someone yell from the area, "Hurry up." Franco could not tell whether the voice was male or female; however, the man moved in that direction and went out of Franco's sight.

Oswaldo Zarceno and his companion Pedro Gonzales were in a van outside Burger King restaurant across from the Taco Bell and Round Table Pizza. They were about to eat food they had just bought at Burger King when they saw a man run from the area behind the Round Table to a white car on Merritt Street. A white woman with blond hair was driving the car. She made a U-turn at the traffic light at the intersection of the alley, opened the door for the man, and sped away as he jumped in. Zarceno described the car first as a Thunderbird, then as a Cougar, which is similar in appearance.

Deputy Sheriff Miguel Ruiz arrived at the Taco Bell at 10:22 p.m. Other officers were already there when he interviewed Zarceno and Gonzalez and requested a "be-on-the-lookout" bulletin to be broadcast. The dispatch was heard by Salinas Police Officer Robert Griffen who noticed that defendants and their car matched the description in the report. He then detained them until backup officers arrived. He patted King down for weapons and found none. Although it was not a particularly warm night, King was very sweaty and his clothes were damp. He had $425 in cash in his wallet and a $50 bill in one of his pockets. King's white LA Gear shoes were muddy and his shoes and jeans were taken into evidence. Deputy Matthew Davis went to Salinas to examine and photograph King's shoes. He testified that the mud appeared to be the same color and density as the mud near the Round Table Pizza in Castroville.

Blanton and King were placed in separate control cars. Guzman was driven to Salinas where she was shown King. She said she was not sure if he was the robber, but at trial she said she was sure he was. She also asked if the woman with King was the "lady with the scar." After the police said she was, Guzman recognized her as the same woman who had been in the Taco Bell.

The trunk of the car was searched. A print of Blanton's palm and fingertips was found on the trunk of the car near the lock. The trunk contained a loaded gun and a bank deposit bag holding $1025.26 in cash and coins, a tan ski mask, and a pair of black gloves. The bank bag lay under a blue and white plaid flannel shirt. The trunk also contained a black plastic facemask and a black wig. In the passenger compartment, a food bag from Taco Bell was on the rear seat, and between the two front seats was a Taco Bell soda cup. A walkie-talking missing its batteries and battery cover was found on the floorboard behind the driver's seat and another was found in front. Under the driver's seat was a Uniden scanner, a device for monitoring radio frequencies. A backpack containing a black knit cap was on the back seat.

Sanchez identified the gun as the one King used; Guzman said it looked like the gun used in the robbery. Both Sanchez and Guzman said the bank bag was the type of bag into which Guzman put the money from the front cash register, and that the shirt, black knit cap, backpack, and gloves looked like the ones King was wearing during the robbery. Guzman testified that the ski mask was the shape of the one King was wearing but his was darker, and Sanchez said it was not the same because King's had two different openings for the mouth and eyes.

Back in Castroville, police recovered muddy shoe prints leading from a grassy area near the Round Table Pizza restaurant to Merritt Street, a dollar bill near the back door of the Taco Bell and two Energizer batteries farther away, another Energizer battery and a red plastic battery cover under a table near the entrance to the kitchen, and

a black stun gun and another red plastic cover bearing the word "Motorola" on it from a shelf underneath the front counter. Sanchez and Guzman said the stun gun was not theirs. At trial, Guzman said she thought it was something that fell off of King. Sanchez testified that King dropped it. Both witnesses remembered seeing batteries on the floor afterward. A criminalist made an ink impression from King's shoes and compared it to photographs of the shoe prints by Round Table Pizza: he testified that the shoes could have made the prints at the crime scene.

The total receipts at Taco Bell that day were $826.33 and the safe contained $500. $385.71 in cash and coins spread over the restaurant floor was recovered. The net loss was $951.45. The district manager testified that it was the night manager's job to make a bank drop after the restaurant closed. Guzman testified she was a manager's assistant. Her duties included putting the money in bank bags and leaving them in the safe. She was not normally the person who would take the bags to the bank for deposit. That was the job of the general manager who would pick up the bags the next day an deposit them. She has never made a deposit of Taco Bell receipts at night. She might have done it during the day when the manager was unable to.

Defendants stood trial for the second degree robbery of Sanchez and Guzman. The information also alleged that King used a firearm in committing the offenses alleged in counts one and two (Cal. Penal Code §12022.53 (b)) and that King has three "strike" prior convictions from Santa Cruz County and three from Stanislaus Country (Cal. Penal Code §1170.12 (c)(2)), one prior from each of those sets was charged as a serious felony conviction. (Cal. Penal Code §667 (a)(1)). The information also charged King with two prior prison convictions.

Blanton presented the defense that she and King had gone to the Taco Bell for her third sale of methamphetamine to Guzman while her and Guzman's regular supplier, Jessie, was setting up "a business deal" in Mexico. Blanton and King ordered food and ate in the restaurant on the first visit, and Blanton spoke to Guzman about a drug transaction. Since other customers were there, Guzman told Blanton to return about 8:00 p.m. When Blanton returned alone at 8:00 p.m., Guzman handed her a bank deposit bag with about $1,000 in it. Blanton was supposed to use it to buy an ounce of methamphetamine for Guzman. Sanchez was not involved and Blanton did not deal with her. Blanton ordered food and went to the bathroom.

Blanton put her money in the trunk of the car and drove back to the motel room where she and King were staying. She contacted a friend of Jessie's to get the methamphetamine and she waited outside in her car for him for about an hour, but he never showed up. While she waited, she stayed in contact with King in the motel room via walkie-talkie. Around 9:30 p.m. she and King returned to the Taco Bell to tell Guzman that the supplier "had burned me for the money." This was a lie. Guzman got mad and came around to the outside of the counter and pushed Blanton. Blanton fell backwards and the stun gun and a walkie-talkie fell from her jacket. Blanton carried the stun gun for protection. Blanton recalled that King "got in the middle of that and helped me up." She retrieved the walkie-talkie but did not realize parts were missing until she was back in the car. She and King left by the front door.

Blanton claimed the gun in the car belonged to her, not King. She denied loading it or using it for a robbery. The ski mask and gloves belonged to King but neither he nor she wore them. She denied the robbing or intending to rob the Taco Bell. The jury deliberated for about three hours and convicted both defendants.

Respondent's Exhibit F (Unpublished Opinion of the California Court of Appeal, Sixth Appellate District, <u>People v. Robin King, et. al.</u>, H024732, January 27, 2004) at 1-6.

Order Denying Petition for Writ of Habeas Corpus
P:\pro-se\sj.rmw\hc.04\King069den       4

## II. DISCUSSION

**A.     Standard of Review**

The court will entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court may not grant a petition with respect to any claim adjudicated on the merits in state court proceedings unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

For purposes of 28 U.S.C. § 2254(d)(1), "clearly established federal law" refers to the holdings of the United States Supreme Court as of the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). In other words, it is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 123 S. Ct. 1166, 1172 (2003). A state court decision may be "contrary to" clearly established federal law if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-413.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identified the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The relevant inquiry is not whether the state court applied the law erroneously or incorrectly, but "[r]ather that application must be objectively unreasonable." Lockyer, 123 S. Ct. at 1175. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Williams, 529 U.S. at 409. The "objectively unreasonable" standard does not equate to "clear error" because

"[t]hese two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  <u>Lockyer</u>, 123 S. Ct. at 1175.

On a petition for habeas corpus, a federal court looks to the decision of the highest state court to determine whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law.  <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669, n.7 (9th Cir. 2000); <u>see, e.,g., Avila v. Galaza</u>, 297 F.3d 911, 918 n.6 (9th Cir. 2002) (treating state court referee's report as the last reasoned state court decision, where report was summarily adopted by the Court of Appeal and petition for review to California Supreme Court was denied without comment);  <u>Packer v. Hill</u>, 291 F.3d 569, 578-79 (9th Cir. 2002) (where state supreme court denied habeas petition without comment, looking to last reasoned decision of a state court as the basis of the state court's judgment), <u>rev'd on other grounds</u>, <u>Early v. Packer</u>, 123 S. Ct. 362 (2002). It also looks to any lower court decision examined or adopted by the highest state court to address the merits.  <u>See</u> <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1106 (9th Cir. 2004) (because state appellate court examined and adopted some of the trial court's reasoning, the trial court's ruling is also relevant).

Under U.S.C. § 2254(d)(2), a federal court may grant the habeas writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. §2254(d)(2).  The court must presume correct any determination of a factual issue made by a state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**B.     Petitioner's Claims**

**1. Ineffective Assistance of Counsel**

Petitioner contends that his trial counsel was ineffective by: a) failing to object to the admission of the black plastic facemask and wig into evidence and b) failing to challenge jury instructions regarding his co-defendant's admission and willfully false statements.  Petitioner claims that defense counsel's actions had a cumulative effect on the jury's perception of the

strength of the evidence against him, and that but for counsel's alleged errors, petitioner would not have been convicted.

In order to prevail on an ineffective assistance of counsel claim, petitioner must satisfy two separate requirements: first, he must establish that counsel's performance was deficient, i.e., that it "fell below an objective standard of reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

Judicial scrutiny of counsel's performance must be highly deferential. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 689; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). The reasonableness of counsel's decisions must be measured against prevailing legal norms at the time counsel represented the petitioner. Wiggins v. Smith, 539 U.S. 510, 524 (2003) (citing American Bar Association professional standards and standard practice in capital defense at pertinent time).

Petitioner has the burden of "showing" that counsel's performance was deficient. Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir. 1990). Similarly, he must "affirmatively prove prejudice." Strickland, 466 U.S. at 693. Conclusory allegations that counsel was ineffective do not warrant relief. Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995).

**a) Failure to Object to Admission of the Black Plastic Facemask and Wig.**

Petitioner claims that counsel failed to challenge the admission of the black plastic facemask and wig that were found in Blanton's car when petitioner was arrested. Petitioner's counsel had filed an in limine motion to exclude three items found in the trunk of the car: a wig, a tan ski mask and a radio scanner. Petitioner claims that his attorney should have objected to the

1  black ski mask and wig because they prejudicially inflamed the jury and none of the witnesses
2  testified to the chain of custody of this evidence.  Therefore, petitioner maintains that trial counsel
3  failed to act as "counsel" under the Sixth Amendment and that but for counsel's unprofessional
4  errors the result of the proceeding would have been different.  Because defense counsel did object
5  to the admission of the wig in his in limine motion, the court will address the failure to object to
6  the admission of the black face mask.

7      Here, the state appellate court found that defense counsel's performance was not deficient
8  and that there was no prejudice to petitioner.  In reviewing the claim that the trial court
9  erroneously denied the defense in limine motion to exclude evidence, the appellate court found
10 that the trial court properly admitted this evidence because it was relevant to prove that petitioner
11 prepared and committed the crime.  Ex. F at 14-15.  The appellate court noted that it was disputed
12 as to whether Blanton and petitioner committed the charged crime.  The items found in the car
13 suggested that they were prepared to commit an act which would be furthered by the principal's
14 identity being obscured and the activities of local law enforcement monitored.  The appellate court
15 recognized that evidence may be admitted that a person committed a crime, civil wrong, or other
16 act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan,
17 knowledge, identity, absence of a mistake or accident, etc.) but not to prove a defendant's
18 disposition to commit such an act.  See Cal. Evid. Code §1101(b).  This court agrees with the
19 state appellate court's determination.  Here, evidence of the black face mask found in Blanton's
20 car was admissible under § 1101(b) to establish that petitioner and Blanton prepared and
21 committed the charged offense, the disputed issue at trial.  Thus, counsel's failure to file a
22 meritless motion and object to the admission of this evidence was not prejudicial.  See Ex. F at
23 14-15.

24     The court concludes that petitioner fails to demonstrate any prejudice based on counsel's
25 performance in failing to object to the admission of the black face mask.  Even if counsel's failure
26 to object was outside the objective standard of reasonableness, petitioner has not shown that
27 counsel's conduct was so serious as to deprive him of a fair trial, or that there is a reasonable
28 probability that but for counsel's errors, the result of the proceeding would have been different.

1  Strickland, 466 U.S. at 694.  Additionally, the underlying record shows that there was substantial
2  evidence to support the conviction, including  eyewitness testimony and evidence from various
3  sources that the identity of the robbers matched that of petitioner and Blanton.  Ex. F at 10-11.
4  Even if counsel's performance was deficient, counsel's conduct did not result in any prejudice to
5  petitioner and was therefore harmless.

    **b) Failure to Challenge Jury Instructions Regarding Co-Defendant's Admission and Willfully False Statements.**

8    Next, petitioner claims that counsel failed to properly challenge Blanton's statements made
9  at the time of the arrest: that she and petitioner had been to the Taco Bell earlier and that they
10  barely knew each other.  Petitioner maintains that defense counsel should have conducted a
11  pretrial investigation and prepared a proper cross-examination for Blanton's testimony,
12  specifically that she went to the Taco Bell to get money from Guzman to buy methamphetamine
13  and that she returned to lie to Guzman that she and King had been cheated out of the money.
14  Petitioner also claims that his counsel should have established this evidence through the
15  prosecution's witness, Guzman, by questioning her as to whether she was in fact a drug addict and
16  challenging her credibility.
17    Here, petitioner fails to demonstrate prejudice because he fails to show any evidence that
18  counsel's pretrial investigation would have yielded any useful information.  The appellate court
19  found that petitioner's failure to object to these instructions at trial waived the issue on appeal.
20  However, the appellate court then reviewed the merits of petitioner's claim and concluded that no
21  instructional error occurred.  The court reasoned that instructional error occurs only where the
22  complained of instruction causes a reasonable likelihood that the jury misapplied the law.  Ex. F.
23  at 13.  The appellate court noted that CALJIC 2.71 leaves to the jury the task of deciding whether
24  a defendant's statement is an admission and CALJIC 2.03 requires the jury to make a preliminary
25  determination as to whether the defendant did in fact make a willfully false or misleading
26  statement.  Additionally, the trial court instructed the jury that it did not intend to suggest or
27  intimate what the jury should find to be the facts and "'to disregard any instruction which applies
28  to facts determined by you not to exist.  Do not conclude that, because an instruction has been

1  given, I am expressing an opinion as to the facts.'" Ex. F at 13 (citing to CALJIC Nos. 17.30,
2  17.31). Therefore, the appellate court concluded that in the unlikely event that the jury misapplied
3  the instructions, there was no prejudice to petitioner by defense counsel's failure to raise a
4  meritless objection to the jury instructions based upon the strength of the evidence presented at
5  trial. Id. at 13. This court agrees with the appellate court's reasoning and concludes that petitioner
6  has failed to establish that counsel's conduct was deficient as to deprive him of a fair trial, or that
7  there is a reasonable probability that but for counsel's errors, the result of the proceeding would
8  have been different. Strickland, 466 U.S. at 694. Accordingly, the appellate court's determination
9  was not contrary to, or an unreasonable application of federal law, nor was it based on an
10 unreasonable determination of the facts in light of the evidence presented in the state court
11 proceeding. 28 U.S.C. § 2254(d)(1)(2).

### 2. Improper Jury Instructions Pursuant to CALJIC No. 2.03 and CAL JIC No. 2.71.

Finally, petitioner claims that the trial court prejudicially erred by instructing the jury pursuant to CALJIC No. 2.03 on false statements and CALJIC No. 2.71 on how to consider admissions of a false statement. Petitioner contends that these jury instructions were improper and led jurors to presume his guilt. Although trial counsel failed to object to these jury instructions, petitioner maintains that his claim is still cognizable on appeal as affecting his substantial rights. Respondent contends that this claim is procedurally defaulted, because petitioner failed to object to these instructions at trial. Even assuming that the claim is not barred based upon procedural default, the court concludes that petitioner's claim fails on the merits.

CALJIC No. 2.71 provides "an admission is a statement made by [a] defendant which does not by itself acknowledge [his] [her] guilt when considered with the rest of the evidence. You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [Evidence of an oral admission of [a] defendant not made in court should be viewed with caution.]" CALJIC No. 2.71.

The appellate court found that co–defendant Blanton's statement that she and petitioner had been to the Taco Bell earlier was relevant and could be considered an admission based upon the evidence that she and petitioner fit the description of the robbers, and that they were in possession of robbery equipment and the property taken from Taco Bell. Ex. F at 12. The appellate court recognized that "instructional error occurs only when the complained of instruction causes a reasonable likelihood that the jury misapplied the law." Ex. F at 13 (citing to Estelle v. McGuire 502 U.S. 62, 72 fn. 4 (1991)). The court reasoned that "CAL JIC NO. 2.71 leaves to the jury the task of deciding if a defendant's statement is an admission, namely, that it does indeed tend to show guilt in combination with the rest of the evidence." Ex. F at 13.

Similarly, the appellate court noted that CALJIC No. 2.03 requires the jury to make a preliminary finding that the defendant did in fact make a willfully false or deliberately misleading statement about the crimes before the trial: "If you find that before this trial [a] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which [he] [she] is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." CALJIC No. 2.03.

The appellate court found that Blanton's statement that she was with petitioner at the Taco Bell and that she just met petitioner was an acknowledgment that she and petitioner were at the restaurant that had recently been robbed and that she lied about their relationship. Ex. F at 12-13. The appellate court noted that "the jury was also instructed that the [trial] court did not intend to suggest or intimate what the jury should find to be the facts, (CAL JIC No. 17.30) and to 'disregard any instruction which applies to facts determined by you not to exist. Do not conclude that, because this instruction has been given, I am expressing an opinion on the facts.' (CAL JIC

No. 17.31)." Ex. F at 13.

Petitioner contends that Blanton's statement was prejudicial because it could have been interpreted by the jury as an attempt by her to distance herself from the incriminating evidence in the car, thereby shifting blame for the robbery to petitioner alone - which constituted evidence of consciousness of guilt. Upon review of the record, the appellate court found that the trial court's instructions were proper based upon Blanton's statements. The appellate court held that given the strength of the evidence against petitioner and Blanton, even in the unlikely event that the jury misapplied the instructions, that petitioner was not prejudiced by these instructions. Ex. F at 13 (citing to Chapman v. California 386 U.S. 23, 24 (1967); People v. Watson 46 Cal.2d 818, 836 (1956)).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62 at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.

The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). A habeas petitioner is not entitled to relief unless the instructional error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States,

328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see, e.g., Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding Brecht error where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'") (citation omitted). The Brecht standard applies retroactively. See, e.g., McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993) (applying Brecht to pre-Brecht final judgment), cert. denied, 510 U.S. 1020 (1993).

Here, petitioner fails to show that the jury instructions, pursuant to CALJIC Nos. 2.03 and 2.71, "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Upon review of the underlying record, the jury was instructed that it should determine whether a defendant's statement was an admission and whether the defendant actually made a willfully false or misleading statement. The instructions directed the jury to exercise caution when considering out-of-court statements made by the defendant, in order to help it determine whether the out-of-court statements actually were made. Additionally, the instructions provided that conduct is not sufficient by itself to prove guilt and any weight and significance of any statements or conduct were to be determined by the jury. The trial court gave a limiting instruction that it was not suggesting what the jury should find to be the facts based on the precise instructions given, pursuant to CALJIC Nos. 17.30 and 17.31. Moreover, the strength of the evidence presented at trial against petitioner and Blanton was significant. Accordingly, the court concludes that the state appellate court's decision was not contrary to, or an unreasonable application of federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254 (d)(1), (2).

## IV. CONCLUSION

The court concludes that petitioner has failed to establish any violation of his federal constitutional rights in the underlying state criminal proceedings. Accordingly, the petition for the writ of habeas corpus is denied. The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 5/9/08

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge